THORNTON *v.* DAMM.

1. EXECUTION—PAYMENT—EVIDENCE.

Where one of several defendants in execution, under threat of levy on her individual property, gives to plaintiff's attorneys a check for the full amount, with no provision for the money's being in any event returned to her, the transaction amounts to a payment of the execution, even though her attorney testifies that it was distinctly understood that it should not have that effect, but should be deemed a payment merely for the protection of plaintiff's attorneys, the execution to be kept alive and used for defendant's benefit.

2. SAME—PAYMENT BY ONE DEFENDANT—ENFORCEMENT AGAINST CO-DEFENDANTS.

One of several defendants in execution may, after paying the same, recover from his solvent co-defendants their proportionate shares, and no more.

3. SAME—NOTES—CONSIDERATION.

A note given by one of several defendants in execution to a co-defendant, to avoid a threatened levy by such co-defendant to enforce the collection of the execution, which such co-defendant has paid, the maker of the note having paid in cash his proportionate share, is without consideration and void.

Error to Muskegon; Russell, J. Submitted April 19, 1899. Decided July 5, 1899.

*Assumpsit* by Anna C. Thornton against Peter Damm upon a promissory note. From a judgment for plaintiff, defendant brings error. Reversed.

*Arthur Jones*, for appellant.

*Stephen H. Clink*, for appellee.

MONTGOMERY, J. This is an action on a promissory note made by defendant August 10, 1897, payable to the order of Stephen H. Clink, and indorsed by him in blank.

The face of the note is $100, and the recovery was for the amount, including interest,—the whole sum being $108.60. The defendant brings error.

The defense relied upon in the court below and in this court was duress and failure of consideration. Briefly stated, the circumstances under which the note was given were as follows: In 1896 some 40 residents of Muskegon, including both plaintiff and defendant, had engaged in a contest over the taxes assessed against their property. In this contest they had been unsuccessful, with the result that execution issued out of this court in favor of the auditor general and against the contestants in that case, amounting to $256.96, including sheriff's fees. Mr. Clink, from the date of the issue of this execution, acted as the attorney of Mrs. Thornton. Bunker & Carpenter were attorneys for the auditor general, the plaintiff in execution. Mr. Clink was a witness, and testified as follows:

" I was endeavoring to help her to protect her interests. The execution was in the hands of the sheriff. Bunker & Carpenter, I guess, had control of it. Prior to the taking of this note from Mr. Damm, Mrs. Thornton had given a check for the amount of the execution to Bunker & Carpenter, but not in payment of the execution. They had threatened to levy upon her property, and the check was given to prevent the levy. It was done some days prior to the making of this note. I couldn't give the amount exactly, but I think it was $256.66. It represented the full amount of the execution, together with the sheriff's fees for collection. After that check was given, no further effort was made to collect the execution from Mrs. Thornton. That was the arrangement with Bunker & Carpenter,—that they should take that check for the purpose of making them whole, so they would be safe in the matter, and could have the use of the money if they wanted it; but it was distinctly understood that it did not pay or satisfy that execution, and that the execution should be kept alive and used for the benefit of Mrs. Thornton. I told Bunker & Carpenter to direct the sheriff to make a. levy on Mr. Damm's property. I may also have told the sheriff to make the levy, but I required of Bunker & Car-

penter that they do that,—or of Bunker; I did all the business with Mr. Bunker. I believe the sheriff did go and attempt to collect that execution from Mr. Damm. I told him to, and I told him to make a levy if he did not get the money. That was before the note was given. After that Mr. Damm came to see me. There was no threat to make a levy, so far as I know. My instructions were to make a levy, not make any threat about it; to go down and get that money, or make a levy on Damm's property. We wanted Mr. Damm to bear an equal part of it, and get a hold, and try to do something to help collect in. I don't know that any particular amount was settled upon. I think that was left with the idea that we would arrange that when somebody was set in motion with that execution. I couldn't say why Mr. Damm came to see me, whether or not because of the threat which he claims had been made by the sheriff, but I suppose he came because he thought the execution was going to be levied upon him. He told me the sheriff or deputy sheriff had been there to make a levy on his property. I do not know whether Mrs. Thornton sent him to me or not. I don't know whether he told me she did or not. I demanded that he pay $126, and I told him that, unless he did pay that, this execution would be levied upon him to compel him to pay it. I suppose I told him that, because that is what I meant to do, and, if he hadn't given that note, there would have been an execution levied on his property,—that very execution would have been levied. I told him some collections had been made. I don't remember that I told him about how much remained uncollected. I do not think that my idea was at that time to make him pay the uncollected portion of the execution; my idea was at that time that each one should assume about one-half of that matter.

"Now, I looked upon it that these two were the pecuniarily responsible ones of the lot, and that Mrs. Thornton had had to put up all the money, and there wasn't another soul on the list that wanted to make a move in any way, shape, or manner to get a cent. Her money was gone from her. I proposed that Mr. Damm should share that responsibility with her, and should do just as much hustling as she did, now she had put up the whole of it. As I say, some little amount had been collected; there could be no mistake about that, nor any injustice about it. I am explaining to you just what basis I proceeded upon. I

wanted to state that if Mrs. Thornton collected more than her share of it, or more than her half, it would be turned over to help out, and if he collected more from these parties (and they all had an opportunity to go to these people and collect), and if he collected more than his part that he assumed, he could turn it over to her.    I told him she had made some collections.    I didn't know how much she had collected.    I didn't tell him she had collected one-half the execution.    I didn't tell him whom she had collected from.    I did not know who paid.    I did know of one occasion where some few dollars were paid in my office, but just what it was I didn't know,—by Mrs. Miller.    I do not think there was any division made of the parties who were liable, no agreement as to whom Mrs. Thornton was to collect from and whom he could collect from.    I do not believe any statement was made to Mr. Damm as to who had paid.

"Whatever arrangement was made between myself and Mr. Damm was made with the view of allowing both these parties to collect from the remainder of the persons named in the execution,—collect whatever they could to recoup for the amount that they had put up.    I had instructed Mrs. Thornton to make all the collections she could.    I am not sure whether I deducted from the gross amount of the execution the amount that Mrs. Thornton had collected, and divided up the remainder in two parts, one-half of which should be shared by Mr. Damm and the other by her, or whether I took out what I figured would be Mrs. Thornton's own share,—what she should have paid individually,—and then let each of them divide the balance.    I have forgotten just exactly what basis.    I am inclined to think that I deducted the share that Mrs. Thornton would have to pay if these people paid equally.    I am not sure whether that was $6 or not, because I am not sure of the number of persons in the execution.    I think there were something over 40.    It would probably be about that amount.    I suppose I showed Mr. Damm the basis for the demand.    I don't know whether I figured it out to him or not."

The defendant testified as follows:

"I gave the note at Mr. Clink's office.    The deputy sheriff came down with an execution, and was going to levy on my property if I didn't pay up that execution for the Supreme Court costs.    This was a few days prior to the

120 MICH.—33.

time I gave the note.  *  *  *  I went to see Mr. Clink
the same day.  I told him I was sent there, had seen Mrs.
Thornton, and she told me to go to him about it.  He
says, ' Well, it's got to be paid, or else it will have to be
levied on your property.'  He figured out how much I had
to pay, and told me it was $126.  I don't know how he
figured it.  He said there was some collected on that exe-
cution, and, if I paid that for my share, then that would
cover it.  He didn't tell me any sum that had been col-
lected; he said somewhere about $130.  He required me
to pay the balance of it, and said that, if I didn't, it would
be levied on my property.  I paid him $26 in money, and
gave this note.  I didn't have any other reason for giving
this note than that of saving my property from the levy of
this execution.  I would not have given this note had it
not been for the threats to levy on my property if I didn't
give it.  I didn't owe Mrs. Thornton anything.  The note
was given to Mr. Clink, but was to pay this debt."

Cross-examination by Mr. Clink:

" I guess that you told me that Mrs. Thornton had put
up the entire amount of this execution.  You told me I
could go and take that execution and levy on somebody
else.  You offered me a list on typewritten paper, and
told me to go and make collections.  I.guess I told Mrs.
Thornton that she had more time to collect than I did.  I
know I was up there, but I don't just exactly remember
what our conversation was.  I think that was the same
day or the day after giving the note.  I know it wasn't
more than a week.

"Q. You never made any effort to get any of these
people named in this execution to pay their share ?

"A. Well, I kind of thought I had done wrong already
to settle it the way I did, so I thought I would not try to
do anything there in that case, you see.

"Q. You didn't say anything that you were dissatisfied
until the note was due, did you ?

"A. No; I did not."

It also appeared that, before the note in question was
given, Mrs. Thornton had received from various parties
who were liable jointly with herself and defendant their
respective proportionate shares of the amount of the execu-
tion, and had given them receipts agreeing to save them

"harmless from any further payments or costs for and on account of said execution."

The contention of defendant is that, before payment of the execution, it might have been enforced against either one of the many defendants, and that such defendant would be entitled to recover of each of his co-defendants ratably an aliquot part of the whole; that in no event could he recover more than such a sum as would be produced by dividing the amount paid among the solvent debtors. It is the further contention that, under the evidence in this case, the execution was paid by Mrs. Thornton, and the rule governing her rights is that given in Beach on Contracts (section 682): "Where one of two defendants in a joint judgment pays it, but not with the intention of discharging it, he may enforce the judgment against the co-defendant for his legal proportion of the debt"— and that this was the extent of her right.

On the other hand, plaintiff's counsel contends that the testimony does not show payment by Mrs. Thornton, because she parted with the money on the strength of the distinct agreement that the money should not pay the execution, and should not be received for that purpose, and that the arrangement was in all respects a fair one, by which the parties, finding themselves jointly liable, divided the loss. The court instructed the jury in accordance with plaintiff's theory, and in effect that, if the defendant understood the situation, he was liable on the note.

If the amount of the execution had been divided among the solvent debtors, the share of each would have been about $13. Defendant had paid $26 in cash, aside from the note in question, so that the question whether there was any consideration for the note must, in our opinion, be determined by ascertaining what right the plaintiff had, as against him, when the note was taken. If there had been no payment of the execution by plaintiff, there was nothing to prevent an agreement as to a division of their burdens, if made in good faith on both sides; and, as the jury found there was no deception in the case, the question again

recurs, Was there a previous payment by the plaintiff? for, if there was, the law defines the extent to which the writ of execution remains available.   While the plaintiff may elect to proceed against any one of numerous co-defendants, the law does not warrant him in placing a weapon in the hands of. the one called upon to make payment with which he can attack another co-defendant. Such an agreement would be against public policy.

We have no doubt, from Mr. Clink's testimony, that the money was paid by Mrs. Thornton to Bunker & Carpenter on this execution.   He says the arrangement was that Bunker & Carpenter should take the check for the purpose of making them whole, so that they would be safe in the matter, and could have the use of the money if they wanted it, but that it was distinctly understood that it did not pay or satisfy that execution, and that the execution should be kept alive and enforced for the benefit of Mrs. Thornton.   There is no suggestion that in any event the money was to be returned to Mrs. Thornton, and, so far as the agreement to keep the execution alive is concerned, it is treated as an agreement to permit Mrs. Thornton to enforce the execution against her co-defendants to the extent that the law justified a resort to them, *i. e.*, for their proportionate share.   The attempted use of this execution to enforce the collection of the full face, made by Mrs. Thornton's attorney, was unauthorized; and the note given to avoid such a levy was without valid consideration.   The verdict should have been directed for defendant.

Judgment reversed, and new trial ordered.

The other Justices concurred.